# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2178
_____

Jaryl Ellis, et al.

*Plaintiffs - Appellants*

v.

Robert P. Houston, et al.

*Defendant - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: January 16, 2013
Filed: February 3, 2014

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Five African American officers who worked in the maximum security Nebraska State Penitentiary brought this action under 42 U.S.C. §§ 1981 and 1983 against five supervisors for race based harassment and retaliation. They seek both injunctive relief and monetary damages. The district court granted summary judgment to the defendants after examining the evidence "as if there were but a single plaintiff and

a single defendant."  The black officers[1] appeal, arguing that the district court dismissed valid claims for racial harassment and retaliation.[2]  After studying the record, we reverse the dismissal of the harassment claims against Sergeant Miles and the retaliation claims of Officer Ellis against Lieutenants Stoner and Haney but otherwise affirm.

I.

Appellants Jaryl Ellis, Aaron Delaney, Michael Hunter, Tiffany Johnson, and Paul Zeiger are black prison guards who worked in the first shift at the Nebraska State Penitentiary during the relevant time period.  The hours of the first shift were 6 AM to 2 PM.  While 30 percent of the prison population is black, the five appellants were at the time the only African Americans among the 95 guards working on the first shift. Hunter began at the prison in 2006; the others started in 2008 and 2009. Appellants Ellis, Delaney, and Johnson are all officers; Hunter is a caseworker; and Zeiger is a corporal.  Their five immediate supervisors on the first shift were Lieutenants Sean Runge, Kevin Stoner, and Chad Haney; Sergeants Chad Miles and Timothy Furby.

---

[1] Although "Officer" is a particular rank held at the prison, the terms "guard" and "officer" are used interchangeably in the record to refer generically to nonsupervising members of the first shift.

[2] The officers do not appeal the dismissal of their claims for disparate treatment or against Robert Houston, Director of the Nebraska Department of Correctional Services, Frank Hopkins, his deputy, Dennis Bakewell, Warden of the Nebraska State Penitentiary, and Major Barry Loock, supervisor of the prison guards.  Associate Wardens Cathy Sheair and Joseph Staley were dismissed by stipulation.

On review of the summary judgment granted to the supervisors,[3] we must view the facts in the light most favorable to the black officers. Wierman v. Casey's Gen. Stores, 638 F.3d 984, 989 (8th Cir. 2011). Our review of the factual background is based on an extensive record which includes discovery taken from each plaintiff and from each defendant, as well as from uninvolved officers on the first shift and from prison officials. Our task at this point is not to decide disputed facts or to weigh issues of veracity, and we begin with the record produced in the district court. See Pritchett v. Cottrell, Inc., 512 F.3d 1057, 1063 (8th Cir. 2008).

The record does not reveal a single starting date for the race based harassment the plaintiffs say they suffered at the penitentiary. Caseworker Hunter, the plaintiff who had been employed at the penitentiary the longest, testified that many former black employees had left the prison because they became "fed up" with the racial environment. Plaintiffs have provided evidence that by early summer 2010 they were experiencing demoralizing race based taunts and jokes which were permitted and joined in by their supervisors. The supervisors made insulting racial remarks in their presence and failed to stop or reprimand similar conduct by other guards.

After enduring such harassment for months, the black officers reported it to authorities in the Nebraska prison system. Thereafter, the supervisors retaliated against them by increasing workloads and assigning them undesirable jobs. After raising their concerns about the harassment to prison officials, two of the five plaintiffs were transferred to less significant penal institutions with fewer overtime possibilities.

---

[3] In Vance v. Ball State University, 133 S. Ct. 2434 (2013), the Supreme Court limited the definition of "supervisor" in Title VII harassment cases to persons "empowered by the employer to take tangible employment actions against" an employee. Id. at 2439, 2446.

## A.

As soon as the black officers entered the prison to begin their work day, they faced humiliating and aggressive treatment by drug dog handlers stationed at the entrance. The dogs were used to ensure that contraband was not smuggled into the prison, but the appellants testified that the handlers would aggressively press the dogs onto them while white officers were allowed to proceed into the hallway unmolested. Then in the hallway on the way to roll call, the black officers were regularly subjected to offensive statements referring to them as "the gang," the "home boys," or "the back of the bus."

The morning roll call at the penitentiary was a point at which much of the harassing conduct occurred. The black officers allege that they were subjected to an ongoing stream of racial jokes and remarks by members of the first shift. Roll call was held in the cafeteria at the beginning of the work day, and all 95 members of the first shift and their five supervisors were typically present. The atmosphere was generally loud and boisterous, with members of the shift conversing and exchanging news prior to beginning the day's work. There were frequent race based comments like "it smells like fried chicken" or the black officers must be happy with watermelon on the menu. The officers also heard statements like "it's dark in the corner" if any of them happened to gather at one end of the cafeteria and remarks like "if the lights went out all you would see is white teeth."

The supervisors gave out the day's assignments to each member of the shift at the roll call. The record indicates that individual officers on the first shift did not perform a single function at the penitentiary. Rather, each officer was rotated through a variety of different jobs, some of which were more desirable and prestigious than others. While officers were permitted to request particular positions, the supervisors had authority to decide which officer would fill each job.

There was evidence that the five supervisors were present and often laughing, smirking, or chuckling at the racial taunts. Several white members of the first shift testified in their depositions that supervisors not only laughed at the racially derogatory remarks made in their presence, but took no cautionary or disciplinary action against the speakers. The black officers testified that they felt powerless to respond to the remarks directed at them. In the words of Caseworker Hunter, "the people that you report to [are] the same people that's laughing and joking" with those making racial comments.

The record indicates that supervisors also joined more directly in the harassing conduct. In front of the roll call, Sergeant Miles linked the black guards with fried chicken and watermelon and making it "dark in the corner" where they typically lined up. Miles also made negative statements in reference to Officer Tiffany Johnson's hair style like "this ain't no hair show" and "this isn't the hood." Lieutenant Runge referred to the black officers as the "back of the bus" and "the hood." Lieutenant Stoner referred to Corporal Zeiger as "Corporal Zigger," and Sergeant Furby used the word "nigger." The record indicates that all the black officers became aware of such comments even if each was not present when every one was made.

Appellants testified that the harassment caused them severe stress, anxiety attacks, depression, and heightened blood pressure. Hunter's hair began to fall out due to the strain he was under, and Delaney suffered outbreaks of hives. The record indicates that the hostility directed at the appellants reached a point where they even came to believe that their fellow officers would not assist them if they were attacked by inmates or found themselves in danger. Some white members of the first shift warned the black officers to "watch [their] back[s]." The black officers' fears were amplified when no white officer came to help Officer Johnson when her alarm activated accidentally.

Ellis testified that while the black officers had initially tried to ignore the offensive remarks, their restraint only encouraged more "brazen" conduct by the first shift staff. On a day when Officer Ellis had had enough of the harassment, he exclaimed "damn the jokes" and "enough is enough." Although supervisors Miles, Runge, and Stoner were present when Ellis expressed his frustration, they failed to say anything or take any action in response. The record reflects that they just grinned. Ellis later reported specific instances of racial harassment to both Lieutenant Runge and Sergeant Furby, but no action was taken by either in response.

B.

The penitentiary's administrative regulation 112.07 governs how supervisors and managers are required to respond to instances of racial harassment. The regulation defines "workplace harassment" as "any verbal or physical conduct of a discriminatory nature, (inflammatory comments, jokes, printed material and/or innuendo), based, in whole or in part, on race, color, sex, religion, age, disability or natural origin" if its intention or result is an intimidating, hostile, or offensive work environment or it unreasonably interferes with a person's work or employment opportunities. The regulation requires that any supervisor "who receives a complaint alleging workplace harassment or who is otherwise aware of a situation involving a potential workplace harassment" must immediately inform the prison administrators about it. A.R. 112.07(I)(A).

According to Officer Ellis, he reported instances of harassment to Lieutenant Runge and Sergeant Furby and made the reports required by regulation 112.07. After two weeks went by without any response, Ellis asked Sergeant Furby for an update. Furby replied that he had spoken to one officer whom Ellis had complained about for making racist remarks and he advised Ellis to stay away from that individual. Sergeant Furby did not report these events to the prison administrators as required by

regulation 112.07.  When questioned during a subsequent investigation, Furby stated that Ellis had asked that his complaint be kept quiet.

Appellants became dissatisfied with the lack of action in response to the ongoing harassment they experienced.  In September 2010 they wrote a joint letter to Major Barry Loock, the ranking officer in charge of the prison guards.  In this letter they described the racially hostile environment that they experienced in the Nebraska State Penitentiary.  They reported that there were persistent racial remarks made in conversations and at roll call.  They complained that supervisors and guards frequently asked them to explain why "blacks act that way" when black inmates misbehaved.  Offensive comments were made about the qualities of black hair and black hairstyles. The black officers complained that they were being given extra work compared to white guards and being warned that it was "suspicious" if they talked too long to black inmates.  The five officers also told Major Loock that the complaints made by Officer Ellis to Sergeant Furby and Lieutenant Runge had gone unaddressed.  The black officers asserted that the lack of responsive action showed that their supervisors were not serious about combating racial harassment in the prison.  They told Major Loock that such acts made them feel like inmates themselves.

An investigation by the prison authorities followed Major Loock's receipt of the September letter.  In October 2010 prison officials visited the penitentiary and interviewed the black officers, as well as their supervisors and members of the first shift alleged to have engaged in racial harassment.  During these interviews Warden Dennis Bakewell initially indicated that the black officers would all be transferred to separate institutions, but he retreated from that plan after they all objected.  Sanctions were eventually imposed by prison authorities on three of the supervisors: Lieutenant Runge and Sergeant Furby were disciplined for having failed to report the harassment complaint submitted by Officer Ellis, and Sergeant Miles was disciplined for his own racist remarks.

The black officers claim that these sanctions did not change their environment or supervisor participation in the continuing harassment. The same type of offensive remarks were repeated "over and over again" after the sanctions had been imposed by the prison authorities.

C.

Appellants allege that their supervisors retaliated against them for having submitted their complaint to Major Loock. Even though their complaint was supposedly confidential, other officers on their shift acted as if the black officers were responsible for the subsequent investigation by prison officials. Appellants contend that a deputy warden leaked details about the investigation to other employees at the prison, which allowed the supervisors and everyone else on the first shift to know that the black officers had complained.

According to appellants and to independent witnesses, treatment of the black officers changed dramatically after the supervisors learned about the official investigation. The black officers report that they were then shunned by supervisors and other officers, who either glared at them when they entered a room or refused to acknowledge their presence. Some of the white officers on the first shift later testified that the supervisors ran a "good old boys" system, doling out preferential treatment to officers they liked and punishing those they disfavored.

In his deposition Lieutenant Stoner could not recall ever having issued a citation to Ellis prior to the black officers' written complaint to Major Loock, but the record indicates that in the months following their complaint both Lieutenants Stoner and Haney charged Ellis for more infractions than any other prison guard received. At one point Stoner cited Ellis for allegedly laughing when a black inmate talked about assaulting a white prison guard. Officer Ellis and two independent officers at the scene denied that he had laughed or behaved inappropriately. On another

occasion, Lieutenant Stoner instructed a subordinate to cite Ellis for briefly leaving his post to use the bathroom. Nothing in the employee manual required that an officer be relieved in order to use the bathroom, and there was evidence that other officers used the bathroom during their shifts without requesting permission.

Negative citations were part of a pattern of acts which discouraged black officers from spending much time interacting with black inmates. While Lieutenant Stoner claimed that interaction between black officers and black prisoners was unprofessional, Warden Bakewell testified in his deposition that prison guards were encouraged to have positive interaction with prisoners, particularly with the goal of providing role models for inmates of the same race. One guard testified that Lieutenant Stoner instructed her to write up Caseworker Hunter for coming to her unit in the middle of a shift even though other staff regularly did so and she had never before been told to report someone who did.

After the black officers' complaint was received by Major Loock, Lieutenant Haney also began issuing additional citations against Officer Ellis. For example, Lieutenant Haney cited Ellis for allegedly faking an illness and required him to produce a doctor's note even though prison policy only required such notes for sick leave longer than 72 hours. Lieutenant Haney later recommended that both Officer Ellis and Corporal Zeiger be transferred out of the penitentiary, claiming both posed a direct threat to the safety of the institution. Lieutenant Haney also accused Ellis of being disrespectful, fabricating racial incidents, and causing

> unnecessary disruption, jeopardiz[ing] the careers of staff members assigned to supervise him and could potentially pose a threat to the safety and security of the facility due to the unpredictable nature of Ellis' behavior and his willingness to lie with regard to any incident.

After Corporal Zeiger indicated he did not want Lieutenant Haney to know his home address, Haney wrote to his supervisors that

because of the way this incident evolved, as well as other incidents that have taken place recently, I believe that Corporal Zeiger['s] continued assignment with the first shift and his continued assignment to the Penitentiary pose a very real threat to the safety and security of the facility, as well as a danger to any manager responsible for supervising him due to the unpredictability that has become increasingly prevalent in directly communicating with Corporal Zeiger.

Corporal Zeiger and Officer Delaney also testified to having been unfairly criticized by Sergeant Furby.

Negative reports by the supervisors were used to justify giving the black officers inferior work assignments. Relying on such reports, the supervisors contended that the black officers were "lazy" and avoided arduous work. Appellants testified, and independent officers corroborated, that after the black officers complained about racial harassment, the supervisors began giving them far more work details than other officers. They were given consecutive laborious assignments, even when other officers were free and available. On at least one occasion Lieutenant Stoner and Sergeant Furby ordered Ellis on a travel assignment to be followed immediately by another job. The standard practice at the penitentiary was to allow an officer returning from a travel duty to take a short lunch break, but that was denied Ellis even though white guards were available for assignments at the time.

In addition to the greater number of assignments received by the black officers, there was evidence that they were disproportionately given less desirable jobs after making their complaint to Major Loock. These unpopular assignments included working in cold storage, doing laundry duty, driving "rover" (a car circling the prison yard to pick up officers), and having more than their share of "tugs" (vehicle escorts), particularly in hot or inclement weather. The black officers were also excluded from more desirable or prestigious jobs necessary for promotion. Such jobs included

"running the yard," which meant having responsibility for overseeing and coordinating the activities of the officers on duty during a particular prison shift.

Corporal Zeiger testified that he volunteered for the type of jobs necessary for him to advance to sergeant, but did not receive the assignments. Like the other black officers, Corporal Zeiger was also receiving a disproportionate share of citations after the supervisors became aware of their formal complaint. The supervisors justified blocking him from such prerequisites for advancement by negative "write ups."

II.

In November 2010 the black officers brought this lawsuit, for violations of 42 U.S.C. §§ 1981 and 1983, against five of their supervisors (Lieutenants Stoner, Haney, and Runge; Sergeants Furby and Miles), as well as five prison administrators and Major Loock. The black officers alleged that they suffered from a hostile work environment because of their race and that they had been retaliated against for reporting workplace harassment. The case was assigned to a magistrate judge who oversaw discovery for almost a year. Among those deposed were each plaintiff, Lieutenants Stoner, Haney, and Runge, Sergeant Furby, prison officials, several other officers on the first shift, and an expert hired by the prison administration to examine whether the penitentiary had a culture of racial bias. Sergeant Miles submitted an affidavit.

In July and August of 2011, in the midst of the ongoing discovery in this case, prison personnel investigator Levi Bennett interviewed officers Ellis and Hunter. They both reported to Bennett that the penitentiary was a conflict filled environment and that they felt under siege by their fellow officers and their supervisors. Both Ellis and Hunter complained that staffers and supervisors on the first shift had lied to support a "buddy-buddy system" based on "race and friendship." Hunter said that he felt more threatened by his fellow shift members than by the prison inmates. Ellis

-11-

complained that Lieutenant Stoner had created false reports accusing him of misconduct and that guards who found themselves on the wrong side of the supervisors were placed in inferior jobs.

Investigator Bennett ultimately recommended transferring Ellis and Hunter to another prison facility. He reported that

> the safety and the security concerns raised by their comments must be addressed. The Nebraska State Penitentiary is a maximum security facility in which staff must be able to work with and trust each other. Mr. Ellis and Mr. Hunter have reported that trust no longer exists. This adversely affects their safety and security as well as that of other staff, inmates, and the public . . . . It also can adversely affect the institution's security.

Investigator Bennett considered the possible transfer of other guards, but concluded that was not feasible "given the extent of the conflicts" and the "inability to identify all of the employees who might be perceived . . . to be involved" in the actions they complained about. He instead recommended transferring those who had brought their complaints to the attention of the prison authorities.

Robert Houston, the Director of the Nebraska Department of Correctional Services, approved the transfer recommendations on August 18, 2011. Caseworker Hunter was sent to the Correctional Center of Lincoln, a medium security facility. Officer Ellis was assigned to the Diagnostic & Evaluation Center, a facility which temporarily holds incoming inmates until they can be permanently placed. Both Ellis and Hunter complain that they make less money at these institutions due to fewer opportunities for overtime work.

Appellants moved for an extension of the discovery deadlines, contending that the transfers of Ellis and Hunter presented new evidence of retaliation and

-12-

discrimination based on race. The magistrate judge agreed to an extension, and additional discovery was taken relating to the transfers. After a trial date was set, the defendants moved for summary judgment, and a stay ensued pending the district court's disposition of the motion.

The district court indicated in its order ruling on defendants' summary judgment motion that it would consider the case "as if there were but a single plaintiff and a single defendant." Whether the court meant that each complainant's evidence would be evaluated individually or that all the evidence would be viewed together was not clear. Its lengthy opinion resembles in appearance and organization a decision on the merits made after a trial. The court's review of the record focused on discrete incidents in the penitentiary involving individual black officers before concluding that the supervisors and administrators were entitled to summary judgment on all counts.

This separation of the evidence into isolated incidents obscured the black officers' common claim that they suffered from a hostile environment in the prison. While it is evident that not each plaintiff or defendant was present for every racial remark or retaliatory act, the record indicates that the black officers were frequently treated as a cohesive group and that many of the events took place in a communal setting. Their complaint to Major Loock about the pattern of racial harassment in the prison was in fact submitted jointly by all five black officers on the first shift.

The black officers reported that they were all made aware of the harassing and retaliatory acts experienced by others. They and some independent members of the first shift perceived subsequent adverse acts by supervisors as retaliation for the black officers' speaking out and complaining to prison authorities. There was evidence of a racially hostile environment within the first shift and of retaliatory acts after the black officers complained to prison authorities. According to their evidence, each work day began in a humiliating environment permeated with racist remarks.

-13-

After separately focusing on discrete acts involving a particular plaintiff, the district court concluded that the conduct complained about was not objectively severe or pervasive enough to alter the terms of employment. In addressing the retaliation claims the district court did not mention any of the additional or less desirable work assignments about which the black officers complained. It also concluded that any negative reports had not resulted in injury or harm to any black officer or been "materially adverse" to him.

The five black officers appeal the district court's dismissal of their racial harassment and retaliation claims against Lieutenants Stoner, Haney, and Runge and against Sergeants Miles and Furby, but not their claims against the prison administrators or for disparate treatment.

III.

This court reviews a district court's grant of summary judgment de novo. Ryan v. Capital Contractors., Inc., 679 F.3d 772, 776 (8th Cir. 2012). Summary judgment is appropriate when no genuine issues of material fact remain after all reasonable inferences are drawn in favor of the nonmoving parties and the moving parties are entitled to judgment as a matter of law. Id.

42 U.S.C. §§ 1981 and 1983 reflect congressional resolve to enforce the rights granted in the Thirteenth and Fourteenth Amendments to the United States Constitution. Section 1983 provides a cause of action to any person deprived of a federal right by someone acting under color of law. 42 U.S.C. § 1983. One such right is the ability of all persons, regardless of race, "to make and enforce contracts." 42 U.S.C. § 1981. The protections offered by § 1981 include a government employee's right to be free from racial harassment. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004); see also Civil Rights Act of 1991, 105 Stat. 1071; H.R. Rep. No. 102-40, pt. 1, at 92 (1991) (reaffirming that § 1981 supports

claims of harassment). The Supreme Court has explained that it is "well embedded" that § 1981 also allows for retaliation claims. CBOCS W., Inc. v. Humphries, 553 U.S. 442, 451 (2008); see also Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 684 (8th Cir. 2012). Such claims are analyzed under the same McDonnell Douglas burden shifting framework as Title VII claims. See Patterson v. McLean Credit Union, 491 U.S. 164, 186–87 (1989).

## A.

In order to establish a hostile work environment claim, the black officers must demonstrate that (1) they belong to a protected group, (2) they were subjected to unwelcome racial harassment, (3) the harassment was because of their race, and (4) the harassment was sufficiently severe or pervasive so as to affect "a term, condition, or privilege of [their] employment." Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 892 (8th Cir. 2005). The fourth element contains both objective and subjective components. The complainant must have subjectively perceived the harassment as severe, Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993)), and the evidence must objectively show that "a reasonable person would find [the environment] hostile or abusive," Singletary, 423 F.3d at 892–93.

The supervisors do not dispute that the black officers subjectively believed that they were subjected to severe and pervasive discrimination and harassment. There was evidence that the officers experienced anxiety, dread, and panic attacks. Hunter testified for example that his hair started to fall out from the stress he suffered. The plaintiffs explained that they felt like they were being treated more like inmates than fellow officers. The five black officers all testified they had previously enjoyed going to work, but now found the job to be depressing and anxiety producing. They also felt personally at risk because they no longer trusted that their fellow officers would come to their aid in a dangerous situation in the maximum security prison in which

-15-

they worked. Such evidence was sufficient to establish a subjective belief that the discrimination they experienced was severe and pervasive.

In deciding whether there was an objectively hostile work environment, the evidence must be examined as a whole. "A [hostile] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) (citation and internal quotation marks omitted). Specific examples cited as discriminatory and alleged to be part of a pattern of hostile treatment are to be viewed as "examples of the offensive racial incidents" experienced by the black officers, not as "an exhaustive litany of every offensive racial slur or incident" which occurred. Ways v. City of Lincoln, 871 F.2d 750, 755 (8th Cir. 1989).

Factors which can demonstrate the magnitude of any harassment include "the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, whether it unreasonably interferes with the employee's work performance, physical proximity to the harasser, and the presence or absence of other people." Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999) (citations omitted). The harassment does not have to be "so extreme that it produces tangible effects on job performance or psychological well-being" to qualify as a change in the terms and conditions of employment. Id.

In order to be found liable a supervisor must have the "purpose" of engaging in unconstitutional discrimination. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Discriminatory purpose requires a decisionmaker to undertake actions "because of, not merely in spite of, the action's adverse effects upon an identifiable group." Id. at 676–77 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (internal quotation marks omitted) (alteration omitted). An individual defendant "is only liable for his or her own misconduct." Id. at 677. To be actionable, the sum total of the

-16-

alleged harassment must be sufficiently severe or pervasive to affect "a term, condition, or privilege" of employment. Singletary, 423 F.3d at 892.

In evaluating "all the circumstances" which establish whether a work environment is objectively hostile, Harris, 510 U.S. at 23, the context in which abusive remarks are made and by whom can increase their severity and the detrimental impact on other employees. Immediate supervisors' racial harassment is likely to "impact[] the work environment far more severely than" similar conduct by coequals. Dandy v. UPS, Inc., 388 F.3d 263, 271 (7th Cir. 2004) (citation and internal quotation marks omitted). Laughing or smirking at racist jokes, as well as failing to report, investigate, or punish known racist remarks of others, can make up an "accumulation of abusive conduct" which poisons the work environment. Hathaway, 132 F.3d at 1222.

Here, the district court focused on discrete incidents involving an individual officer. Our court has previously pointed out, however, that when a pattern of discriminatory conduct is alleged, specific individual acts should be viewed as illustrative rather than as isolated incidents. Ways, 871 F.2d at 755; Ross v. Douglas Cnty., 234 F.3d 391, 397 (8th Cir. 2000). Attentiveness to context helps to assess the objective severity of the conduct. See Hathaway, 132 F.3d at 1222. In this case the black officers alleged that they experienced racist remarks on a near daily basis. Even when the supervisors were not themselves the speakers, they were present and laughing without objection to statements made by others. Such incidents make up part of the context which must be examined to determine whether the conduct of any supervisor was objectively actionable.

A narrow focus on individual acts at the penitentiary cannot adequately capture the nature of the harassment testified to by the black officers in this case. Many of the situations giving rise to the harassment claims were jointly experienced by these officers. Even if the effect of an individual harassing comment might seem relatively

minor when viewed in isolation, the context in which such remarks arose must be considered. Appellants were referred to as a "gang" or "the back of the bus" and addressed with crude comments about the "hood" or fried chicken and watermelon, generally stereotyping them on the basis of race. They testified during discovery that even if each individual did not hear every remark referenced in their complaint or depositions, each black officer became aware of them.

We have previously recognized that evidence of harassment not directly experienced by a particular plaintiff can have relevance in establishing an objectively hostile work environment. See Sandoval v. Am. Bldg. Maint. Indus., 578 F.3d 787, 802–03 (8th Cir. 2009); Williams v. ConAgra Poultry Co., 378 F.3d 790, 793–94 (8th Cir. 2004). Where, as here, there is evidence that the offensive remarks became known to all plaintiffs, their relevance to claims of a hostile work environment is clear. See Hall v. Gus Constr. Co., 842 F.2d 1010, 1014–15 (8th Cir. 1988). The individual remarks cited in the black officers' complaint and revealed in the discovery process were not uttered in a vacuum, but became understood as part of a broader pattern and practice of racial harassment targeted at the first shift's black officers.

After establishing such a broad pattern of harassment, the black officers must still show that any charged supervisor took actions sufficient to create an objectively hostile work environment. As the Supreme Court stressed in Harris, an inquiry into alleged harassment is deeply context dependent, and a determination of the severity of any individual defendant's harassing actions requires "looking at all the circumstances." 510 U.S. at 23 (emphasis added). While "smoking guns" such as overt racial slurs are strong evidence of objective hostility, the Court's holistic understanding of what turns a workplace into a hostile environment has enabled racial harassment claims to succeed in cases with only a single racial slur but other abusive conduct and racially demeaning language disproportionately directed towards black employees. See, e.g., Williams, 378 F.3d at 795. In the case now before the court, the relevant circumstances include the fact that each individual instance of

harassment was experienced by the black officers as part of a larger pattern of hostile conduct by officers on the first shift.

In granting summary judgment in favor of the supervisors, the district court devoted five pages of its opinion to direct quotations from a case it was "guided by," Smith v. Fairview Ridges Hospital, 625 F.3d 1076 (8th Cir. 2010), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). There are however significant differences between this case and Fairview Ridges. As the Fairview Ridges majority explained, "[m]ost of the events [there] involved conduct that was not particularly severe, involved coworkers as opposed to [her] direct supervisors, and could only be considered non-actionable, mere offensive utterances." Id. at 1086 (alteration and internal quotation marks omitted). The incidents there "were relatively infrequent," and several had "no connection to or nexus with an obvious or overt racial incident." Id. at 1085–86.

In contrast to Fairview Ridges, the black officers have produced evidence in this case that over a period of months they underwent a constant refrain of racist jokes at daily roll call in front of the whole first shift. Not only were these comments made in the presence of their supervisors, but the supervisors actively joined in them. The Supreme Court has recognized that individual instances of harassing conduct are reinforced by repetition. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). In its numbered findings the district court focused on particular acts experienced by individual black guards, without considering the cumulative effect of the evidence. Its impact can be overlooked or underestimated when the evidence is viewed only as discrete and isolated incidents. Such an approach also obscures the overall responsibility of any individual supervisor.

The record contains evidence offered both by the black officers and by other witnesses indicated that racist comments were made without objection in a group setting on a near daily basis. Consideration of the whole record is required in order

-19-

to evaluate the objective severity of the conduct of any individual supervisor. See Sheriff v. Midwest Health Partners, P.C., 619 F.3d 923, 930 (8th Cir. 2010); Hathaway, 132 F.3d at 1222; Ways, 871 F.2d at 755. Participation by a supervisor can magnify the impact of harassment. The record indicates that Sergeant Miles took the lead in delivering racist jokes directed at the black officers, with such comments as "smells like fried chicken" or "they are serving watermelon today, I'm sure you guys are happy." Some of the remarks occurred during roll call when all of the first shift officers were present, which accentuated their derogatory impact. See Carter, 173 F.3d at 702. Such behavior by a supervisor tacitly endorses racist remarks by subordinates and indicates to other officers that this type of joke or remark is acceptable and has no negative consequence. The frequency and aggravated nature of Miles' race based comments demonstrate that Miles acted with the "purpose" of engaging in unconstitutional discrimination. See Iqbal, 556 U.S. at 676.

The harassment claims presented by the black officers here bear a striking resemblance to those recognized as valid elsewhere. In Allen v. Michigan Department of Corrections, 165 F.3d 405 (6th Cir. 1999), a black prison officer's racial harassment claim was reinstated on appeal, for he had been "subjected to derogatory racial insults by two of his supervisors . . . on separate occasions" and "his supervisors never investigated or disciplined [a subordinate] white officer caught" harassing him. Id. at 410–11. There is evidence of the same type of harassment and lack of response by supervisors in this case. A verdict in favor of black and hispanic prison guards on harassment claims was also affirmed by the Second Circuit in Snell v. Suffolk County, 782 F.2d 1094 (2d Cir. 1986), based on "specific incidents of racial harassment and ethnic slurs, depicting a general racial animus in the prison against" minority officers. Id. at 1097.

Here, Sergeant Miles was the supervisor most frequently heard making racially charged statements. There was testimony that the harassment of coworkers at the roll call worsened when he was present. The evidence shows that "because of" the

plaintiffs' race, Miles engaged in "purposeful discrimination" by his own comments, as well as by his failure to act to correct the actions of subordinates. See Iqbal, 556 U.S. at 676–77. After studying the record, we conclude that the evidence reveals acts, comments, and inaction by Sergeant Miles sufficient to make out prima facie harassment claims against him, which must be reinstated and remanded. In contrast, there is insufficient evidence of harassment by the other supervisors and therefore the claims against Lieutenants Stoner, Runge, and Haney, and Sergeant Furby should be affirmed.

B.

The black officers also allege that their supervisors retaliated against them after they filed an official complaint with Major Loock. They allege that the pattern of harassment by the supervisors intensified after their complaint was submitted. According to their evidence, they were subsequently assigned inferior or less desirable jobs. The supervisors also allegedly started "papering" their files with reports on trivial or invented misconduct.

In order to prove a prima facie case of retaliation, the officers must demonstrate that (1) they engaged in protected activity, (2) subsequent materially adverse action was taken against them by the supervisors, and (3) the materially adverse actions were causally linked to their protected activity. Weger v. City of Ladue, 500 F.3d 710, 726 (8th Cir. 2007). To be "materially adverse," an action must result in some "injury or harm" that would "'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 644 (8th Cir. 2009) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). The supervisors do not deny that the black officers' complaint to Major Loock was a protected activity, see Chivers v. Wal-Mart Stores, Inc., 641 F.3d 927, 932 (8th Cir. 2011), or that the alleged retaliatory acts were causally related to the

-21-

officers' complaints. The main controversy regarding this prima facie case is whether the alleged retaliatory acts were "materially adverse" to the black officers.

After the harassment complaint to Major Loock became known, Officer Ellis testified that he was singled out for additional work details, that the supervisors would walk by fifteen available white employees on the yard in order to direct him to take on extra tasks, that when paired with white partners he was given the majority of the work, and that he was consistently forced to take unpopular details, such as "cold storage." Ellis was also repeatedly singled out for discretionary jobs which drew him away from his regular duties, "running" him across the prison yard from one task to the next. He was called on by the supervisors to do arduous tasks back to back and with no break, even when other officers were available for the work. The record demonstrates that Ellis primarily attributes this retaliation to Lieutenants Stoner and Haney.

As the Supreme Court pointed out in Burlington Northern, reassignment of duties may be an adverse employment action even if the new roles are within the same job category. 548 U.S. at 70. The Court observed there that

> [a]lmost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that [he or] she spend[s] more time performing the more arduous duties and less time performing those that are easier or more agreeable.

Id. at 70–71.

Ellis also alleges that Lieutenant Stoner and Lieutenant Haney began "papering" his record with reports for trivial or unsubstantiated allegations. While such reports are not themselves disciplinary actions, they form part of the record

which prison supervisors use in deciding whether to bring disciplinary proceedings. They allege that negative reports were manufactured by their supervisors who ignored evidence to the contrary.

Retaliation claims can be shown by a pattern of false or retaliatory reports with other evidence of tangible harm. See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997). In Kim, for example, we concluded that papering of targeted employees supported a prima facie retaliation claim since it was coupled with lowered performance evaluations, reduced workloads, and special remedial training. Id. In contrast, two allegedly false and unfair reports of misconduct with no significant consequence did not establish retaliation in Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 786 (8th Cir. 2007). Here, Ellis' claims of papering do not stand alone but rather are partnered with additional evidence of retaliation. They are thus properly included in the corpus of evidence a factfinder could use to determine that the totality of the alleged retaliatory actions was materially adverse to him.

Ellis finally contends that his transfer to another correctional institution is evidence of materially adverse retaliation. The penitentiary's investigator, Levi Bennett, had warned that the safety of both the prisoners and the guards would be at risk if Ellis perceived that he was being targeted by his supervisors and by fellow guards. As Bennett observed, it is essential in a maximum security prison that guards "be able to work with and trust each other." It appeared to Bennett that for Ellis, "that trust no longer exists." It was the prison administrators who authorized the transfers, however, and the record contains no evidence that the supervisors were responsible for them.

After studying the record and viewing the evidence in the light most favorable to Ellis, see Wierman, 638 F.3d at 989, we conclude that the retaliatory acts taken against him by Lieutenants Stoner and Haney were materially adverse employment

actions sufficient to support a prima facie case of retaliation. These claims should therefore be reinstated.

On the other hand, we agree with the district court that the retaliation claims of the other plaintiffs were insufficiently supported to survive summary judgment. Officers Johnson and Delaney identified certain instances of inferior work assignments, but they were too isolated to substantiate a viable claim. Caseworker Hunter stated in his deposition that he had not received inferior work assignments, and he was transferred out of the penitentiary by prison administrators who are not parties here. Although Corporal Zeiger testified that he was denied assignments to posts that were necessary for a promotion, he did not identify any specific supervisor responsible. The dismissal of the retaliation claims by these officers should therefore be affirmed.

## IV.

The supervisors finally argue that they are entitled to qualified immunity. A government official is protected by qualified immunity if his conduct failed to violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to ensure that government "officers are on notice" of what conduct is unlawful, Saucier v. Katz, 533 U.S. 194, 206 (2001), and its protection operates as "an immunity from suit" rather than simply a defense to liability, Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted).

A public official is entitled to qualified immunity from suit unless (1) "the official violated a statutory or constitutional right," and (2) "the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (quoting Harlow, 457 U.S. at 818). In analyzing a claim of qualified immunity, we may address these elements in either order. Pearson v.

Callahan, 555 U.S. 223, 236 (2009). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). We look to the state of the law as it existed at the time of the conduct complained about in order to determine whether a reasonable supervisor would have understood his actions would violate the black officers' rights. Wilson v. Layne, 526 U.S. 603, 609 (1999). There "need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution." Young v. Selk, 508 F.3d 868, 875 (8th Cir. 2007) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). The unlawfulness of the action "must merely be apparent in light of preexisting law." Nelson v. Corr. Med. Servs., 583 F.3d 522, 531 (8th Cir. 2009) (en banc).

At the time of these events in the Nebraska prison the law was clearly established that race based harassment and retaliation would violate black officers' constitutional rights. By then, the Supreme Court had ruled that employees are protected from race based harassment under 42 U.S.C. § 1981. Jones, 541 U.S. at 383; see Harris, 510 U.S. at 22 ("A discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."). In CBOCS, the Court had made clear that employers cannot lawfully retaliate against an employee based on race and that § 1981 provides a cause of action for any employee experiencing such retaliation. 553 U.S. at 457.

Courts have long recognized as "clearly established" an employee's right to be free from an adverse action "based on racial discrimination or in retaliation for exercising his rights." Turner v. Ark. Ins. Dep't, 297 F.3d 751, 753 (8th Cir. 2002). As the Seventh Circuit explained in 1993, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the

-25-

presence of his subordinates." Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) (citation and internal quotation marks omitted). In a 1986 case with similar facts to the one before our court, the Second Circuit upheld a verdict in favor of black and hispanic prison officers subjected to a "continuous racially invidious climate" involving racial epithets and the fear that"white officers might not respond to their calls for assistance." Snell, 782 F.2d at 1098–99.

A case closely resembling the claims here was reinstated by the Sixth Circuit in 1999 after having also been dismissed by the trial court. Allen, 165 F.3d at 413. There, a black prison officer had testified that "he received unwarranted disciplinary action; he was monitored more closely than non-black employees; he was not promoted to sergeant; [and] he was subjected to racial epithets and insults by supervisory personnel." Id. at 410. In Kim, our court ruled that a minority employee had a valid claim where he had been "systematically retaliate[d]" against for complaining about racial discrimination in his workplace. 123 F.3d at 1060–62. The retaliation included  being assigned inferior work, given lower performance evaluations, having his file "papered" with false reports, and being disciplined for a fabricated racial incident with a coworker. Id. at 1060–61.

Long before the actions of supervisors in this case, the Supreme Court had recognized employee rights to be free from racial harassment and retaliation in Jones, 541 U.S. at 383, and CBOCS, 553 U.S. at 451. In light of this preexisting law it was readily apparent that a "continuous racially invidious climate" in a penitentiary, Snell, 782 F.2d at 1099, and undertaking "systematic[]" retaliation following complaints, Kim, 123 F.3d at 1052, would violate clearly established rights. Nelson, 583 F.3d at 531. The purpose of qualified immunity is to "excuse an officer who makes a reasonable mistake in the exercise of his official duties," but not one who "intentionally abuse[s] a person's known rights." Edwards v. Baer, 863 F.2d 606, 607 (8th Cir. 1988).

The black officers presented evidence here that the Nebraska penitentiary's own administrative regulation 112.07 recognized that inflammatory racial comments and jokes violate employee rights. Any reasonable supervisor would have recognized that racial slurs and remarks like those used here would illegally affect the working environment. See Rodgers, 12 F.3d at 675. As in the prison in Snell, there is also evidence that conduct by the supervisors at the Nebraska penitentiary caused black guards to question whether white officers would come to their aid if they were in danger. 782 F.2d at 1098.

The evidence in this case is nearly identical to that shown to violate the law in Allen, including black officers being monitored more closely than white employees and told not to congregate in the yard, receiving baseless citations, and being denied career advancement opportunities. 165 F.3d at 410–11. There was also evidence here that such treatment made it difficult to retain officers of color at the penitentiary. As in Kim, the record shows a pattern of "systematic[]" retaliation against the black officers. 123 F.3d at 1052. Following their complaint, the supervisors "papered" the officers' files with citations, assigned them more arduous work, and monitored them more closely than white officers. Id.

We conclude that existing precedent put the supervisors on notice that such actions would violate constitutional rights. A reasonable prison supervisor would have understood that permitting and participating in racially derisive remarks and assigning inferior work assignments would violate the black officers' rights under §§ 1981 and 1983. Based on the record evidence, Sergeant Miles has not shown that he is entitled to qualified immunity on the black officers' harassment claims, nor have Lieutenants Stoner and Haney shown they are entitled to qualified immunity on the retaliation claims of Officer Ellis.

-27-

V.

Now therefore we **reverse** and reinstate the harassment claims against Sergeant Miles and the retaliation claims of Officer Ellis against Lieutenants Stoner and Haney, **affirm** the dismissal of all other claims, and **remand** to the district court.

LOKEN, Circuit Judge, concurring in the judgment, joined by COLLOTON, Circuit Judge.

Substantially for the reasons stated in Judge Murphy's opinion, I concur in the decision to reverse the grant of summary judgment dismissing plaintiffs' hostile work environment claims against Sgt. Miles and plaintiff Jaryl Ellis's retaliation claims against Lt. Stoner and Lt. Haney, and otherwise to affirm the decision of the district court. I write separately to emphasize the relevance of important differences between *employer* liability under Title VII and *individual* liability under 42 U.S.C. §§ 1981 and 1983.

1. Incidents of racial harassment aimed at a group of plaintiffs must be considered as a whole in determining whether they created, from the plaintiffs' perspectives, an actionable hostile work environment. Whether a workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to . . . create an abusive working environment" can be determined "only by looking at all the circumstances." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 23 (1993). In opposing summary judgment on their hostile work environment claims, plaintiffs' submitted substantial evidence that they were subjected, as a group, to racially derogatory jokes and comments made on a daily basis at a mandatory roll call session attended by all members of the predominantly white first shift, including their direct supervisors. I agree this was sufficient evidence of severe and pervasive race-based harassment to preclude summary judgment on this ground, whether plaintiffs sued under Title VII or under §§ 1981 and 1983.

-28-

But a defendant's personal liability under §§ 1981 and 1983 requires proof of intentional discrimination *by that defendant*. See General Bldg. Contractors Ass'n v. Pa., 458 U.S. 375, 391 (1982) ("§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination"); Patterson v. Cnty. of Oneida, NY, 375 F.3d 206, 229-30 (2d Cir. 2004); Ottman v. City of Independence, Mo., 341 F.3d 751,2929 759-61 (8th Cir. 2003). Compare Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1111 (8th Cir. 1998) (no individual supervisor liability under Title VII). Even if the individual defendant exercised at least some supervisory authority over the plaintiff, as in this case, liability under §§ 1981 and 1983 is not established merely by proof that the defendant was deliberately indifferent to racial harassment by his subordinates, as we suggested in Ottman, 341 F.3d at 761, or by proof of a "general racial animus in the prison" and "lack of response by the supervisors," as the courts ruled in Snell v. Suffolk County, 782 F.2d 1094, 1097 (2d Cir. 1986), and Allen v. Michigan Department of Corrections, 165 F.3d 405, 410-11 (6th Cir. 1999). In my view, those rulings were overruled by Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), where the Court held:

> In a § 1983 suit . . . where masters do not answer for the torts of their servants -- the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. . . . [P]urpose rather than knowledge is required to impose [§ 1983] liability on . . . an official charged with violations arising from his or her superintendent responsibilities.

Thus, "where the intent to discriminate is an element of the constitutional violation . . . . the plaintiffs must show that the supervisory officials *themselves* acted with an impermissible motive, not merely that they knew of their subordinates' impermissible motives and did not put a stop to their actions." Dodds v. Richardson, 614 F.3d 1185, 1210 (10th Cir. 2010) (Tymkovich, J., concurring), cert. denied, 131 S. Ct. 2150 (2011). Applying this standard to a case where multiple co-workers are

accused of engaging in racial jokes, taunts, and insults that, over an undefined period of time, created a hostile work environment for five minority plaintiffs, is a complex task. It is not enough that a defendant "participated" in the racial taunts and insults and turned a blind eye to harassing conduct by his subordinates. Plaintiffs must prove he acted (and failed to act) for the *purpose* of creating a hostile work environment for the plaintiffs, that is, that he intended to alter the terms and conditions of their employment through severe and pervasive racial harassment. Determining the liability of an individual supervisor or co-worker in this type of case is very different than determining when the public employer is liable for the existence of such a hostile work environment in its workplace. See Vance v. Ball State Univ., 133 S. Ct. 2434, 2441-42 (2013).

Viewing the current record in the light most favorable to plaintiffs, I agree there is sufficient evidence of Sgt. Miles's sustained participation in racial harassment to preclude summary judgment dismissing the hostile work environment claims against him. Plaintiffs allege that Miles made offensive "jokes" regularly over the course of a few months in front of the entire first shift, with one witness describing it as "almost like a daily occurrence." Miles made the majority of the alleged derogatory comments at roll call, and plaintiffs testified that the harassment was worse when he was there. Though the record suggests that Sgt. Miles was not in charge at roll call, he was an employee of superior rank.[4] Even if the insensitive comments were initially thought to be mere teasing or joking, a jury could reasonably infer that a supervisor who continued to participate in the hazing after Ellis, one of the targets, exclaimed, "damn the jokes" and "enough is enough," was intentionally creating a hostile work environment. Taking all of these circumstances into account,

---

[4]This fact is at least prima facie evidence that he acted under the "color of state law" that § 1983 requires, that is, that his alleged harassment "involve[d] the use of either state authority or position." Ottman, 341 F.3d at 762. The parties have not briefed or argued the question whether Miles acted "under color of state law" when participating in the alleged racial harassment.

I agree there is enough evidence in this record to submit to a jury whether Sgt. Miles participated in sufficiently severe or pervasive racial harassment with the purpose of creating a hostile work environment for one or more of these plaintiffs.

The doctrine of qualified immunity is another important difference between Title VII claims against employers and § 1983 claims against individual public employee defendants. Plaintiffs' claims turn on proof of intentional race discrimination. When "improper motive -- such as purposeful race discrimination or retaliation -- is an element of the plaintiff's federal claim," liability for damages is personal, "so each defendant's conduct must be independently assessed." Wilson v. Northcutt, 441 F.3d 586, 590, 591 (8th Cir. 2006); see generally Crawford-El v. Britton, 523 U.S. 574 (1998). In cases such as this, it is certainly relevant to the qualified immunity inquiry that a "continuous racially invidious climate" has been held to be a hostile work environment in some prior cases. But that is not enough. This cause of action is not "a general civility code for the American workplace," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), and in numerous cases we have concluded that some amount of race-related insults or derogatory comments does not create an actionable hostile work environment under either Title VII or § 1983. Pye v. Nu Aire, Inc., 641 F.3d 1011, 1018 (8th Cir. 2011); Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1086-87 (8th Cir. 2010), cert. denied, 131 S. Ct. 2904 (2011); Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1195 (8th Cir. 2006); Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1035 (8th Cir. 2006); Singletary v. Mo. Dept. of Corr., 423 F.3d 886, 893 (8th Cir. 2005); Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759-60 (8th Cir. 2004); Elmahdi v. Mariott Hotel Servs., Inc., 339 F.3d 645, 652-53 (8th Cir. 2003); Burkett v. Glickman, 327 F.3d 658, 661-62 (8th Cir. 2003); Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843-44 (8th Cir. 2002); Powell v. Mo. State Highway and Transp. Dept., 822 F.2d 798, 801 (8th Cir. 1987); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981).

In the district court, Sgt. Miles filed a separate motion for summary judgment, arguing that, in light of these prior authorities, "a reasonable official in Miles' position would not have had 'fair warning' that [the specific comments plaintiffs alleged he made] would cause the deprivation of a Federal right." Sgt. Miles was not deposed, and the record contains only a brief affidavit submitted with this motion stating that Sgt. Miles does not recall making the racially derogatory statements plaintiffs allege. The district court did not reach the qualified immunity issue, concluding that plaintiffs had failed to prove their claim of a hostile work environment on the merits. On appeal, all defendants argue qualified immunity, but only superficially.

Sgt. Miles simply denied plaintiffs' allegations that he was guilty of racially discriminatory conduct, and his motion to the district court understated the extent of harassment alleged by plaintiffs. On this record, I agree we should not affirm the grant of summary judgment on this alternative ground. But the issue is likely to resurface in the district court, before and/or after trial. See Behrens v. Pelletier, 516 U.S. 299 (1996). Because § 1983 liability is personal, proper resolution of the qualified immunity issue would require careful consideration of what Miles did, when he did it, when plaintiffs' workplace first became an actionable hostile environment, and what Miles knew of each plaintiff's work environment at that time and thereafter.

2. Turning to the retaliation claims, a prima facie case of retaliation requires a showing that the alleged retaliation "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006). "Our post-*Burlington Northern* decisions have consistently held that, to be materially adverse, retaliation cannot be trivial; it must produce some 'injury or harm.'" Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 644 (8th Cir. 2009) (quotation omitted). Because "[c]ontext matters" in applying this standard, "reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the

particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." <u>Burlington Northern</u>, 548 U.S. at 69, 71 (quotation omitted).  In the particular circumstances of this case, I agree the evidence of sufficient harm to plaintiff Ellis from Lt. Stoner's and Lt. Haney's retaliatory actions -- frequent, unprecedented adverse write-ups and assignments to less desirable, more arduous duties -- precludes the grant of summary judgment dismissing Ellis's claim of unlawful retaliation by those defendants.

————————————————