United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 97-1314NE

_____

| | | |
|---|---|---|
| John A. Logan, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | On Appeal from the United |
| | * | States District Court for the |
| | * | District of Nebraska. |
| Harold Clarke; John I. Cherry, Jr., Dr.; | * | |
| and Dr. Schroenrock, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: June 10, 1997

Filed: July 10, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit Judge, and
WOLLMAN, Circuit Judge.

_____

RICHARD S. ARNOLD, Chief Judge.

John Logan, a prisoner in the Nebraska State Penitentiary (NSP), filed this action against the defendants for their alleged failure to treat his ailments in an appropriate and timely manner. The District Court[1] granted summary judgment for each of the defendants. We affirm.

_____

[1]The Hon. Richard G. Kopf, United States District Judge for the District of Nebraska.

I.

Logan was committed to the custody of the Nebraska Department of Correctional Services (DCS) in March of 1995. A diagnosis there indicated that he suffered from degenerative disc disease. Defendants, Doctors John Cherry and Reginald Maixner,[2] and Matthew Schroenrock, a physician's assistant,[3] met in April to discuss Logan's medical situation. They concluded that Logan should receive a trial treatment of lumbar steroidal blocks. They also decided to avoid prescribing narcotic pain medication for Logan because he had a history of abusing narcotics.

Logan was scheduled to receive the lumbar blocks in mid-May, but refused to go on the appointed day. The explanation offered by defendants for his refusal is that he wished not to wear restraints. Logan says that he had not been informed of possible side effects from the treatment. DCS has a policy that an inmate who refuses optional medical treatment will not have that treatment offered to him again. Logan contends he was told that if he wrote letters of apology to the appropriate parties, which he says he did, then he might obtain another chance to receive the treatment. Logan did not later receive this particular treatment.

Logan was transferred to NSP in June. Shortly after his arrival he saw Dr. Cherry for treatment of his back pain, and to request a lower bunk in his cell and a bed board for his back. Cherry determined that Logan did not suffer from one of the

_____

[2]Dr. Maixner died while this appeal was pending. He has been dismissed from this appeal without prejudice to reinstatement if an estate is opened for him. See Fed. R. App. P. 43(a).

[3]Defendant Harold Clarke is the Director of DCS. Nothing in the record suggests that his involvement in Logan's treatment went beyond having supervisory authority over the other defendants and promulgating regulations that were applied to Logan's situation.

medical conditions that NSP requires an inmate to have in order to warrant assignment to a lower bunk. The bed-board request was likewise denied. Cherry also denied Logan's request for special shoes that would relieve his back pain, but did request that his shoes be checked for proper fit. (At a staff meeting in July the doctors determined that because Logan had no foot deformity, orthopedic shoes would not be appropriate treatment.) He suggested that Logan take Tylenol or aspirin for his pain, in lieu of the prescription medication requested by Logan. Cherry did provide Logan with some Ibuprofen, as he had requested, later that month and in July.

In July, Dr. Cherry again saw Logan, this time for a rash on his legs. He opted not to treat what he diagnosed as lichen planus, a fungal skin infection, at that time because studies have shown that the disease often goes away without treatment. A few days later Cherry again saw Logan regarding the rash, and told him that he should stop scratching it, as that was exacerbating the problem. A week after that Cherry saw Logan again, and prescribed Lotrisone, an anti-fungal skin cream.

In August, Logan relodged his requests for a bottom bunk and orthopedic shoes, and asked for more Ibuprofen. Cherry denied the first two requests because there was no medical necessity, and suggested that Logan use Tylenol or aspirin as a pain killer. Later in August, Logan saw Dr. Maixner, who examined his rash, and took a culture of one of the lesions on Logan's leg. Maixner prescribed Ampicillin and Motrin, and instructed Logan to clean his lesions twice daily with Phisoderm. This course of treatment proved effective in its first few days, and Maixner instructed Logan to continue with it. At a staff meeting, the doctors again considered Logan's request for a lower bunk, which they determined he did not need, although they concluded that he should be seen by an orthopedic specialist. Dr. Cherry referred Logan to such a specialist when he met with Logan at the end of August. Logan saw the orthopedic specialist in early September. The specialist recommended that Logan see a physical therapist and be provided with special insoles. Logan received the insoles the same day, and saw a physical therapist six days later, who prescribed a variety of exercises.

Later in September, Logan again saw Dr. Maixner about his rash. Maixner concluded that Logan had had an adverse reaction to the antibiotic that he had prescribed previously, so he prescribed a different antibiotic as well as an antihistamine to reduce Logan's itching. A week later the staff decided that Logan should see a dermatologist for his rash. In mid-October, Logan met with a dermatologist via Telemed,[4] who prescribed an anti-inflammatory ointment and more antihistamines. A month later, Maixner suggested that Logan be hospitalized in order that he could be treated more comprehensively and regularly, but Logan refused. Instead, Logan was scheduled to see another dermatologist. Until then, Logan continued to receive pain-killers and antihistamines, with a short break in his prescription for the latter because of the doctor's concerns about addiction. In mid-December, Logan saw the dermatologist, who commenced an aggressive treatment. Shortly thereafter, Logan returned the drugs he was given to the guards and refused to take any further medication. He later agreed to restart his course of medicine.

Logan filed his complaint in the District Court in October 1995 and amended it in December 1995. On cross-motions for summary judgment, the District Court granted the defendants' motion and denied the plaintiff's motion on the ground that the defendants were not deliberately indifferent to Logan's needs. Logan then took this appeal.

II.

---

[4]Telemed is a system that transmits digital pictures of a patient, or other medical information, over a telephone line connected to a computer at a hospital. Doctors there may then diagnose the condition and respond with an appropriate treatment. Its principal advantage is that it permits diagnosis without requiring the prison to transport an inmate to an outside health-care facility.

To establish that the defendants' conduct amounted to a violation of the Eighth Amendment's prohibition of cruel and unusual punishment, Logan must demonstrate that the defendants were deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 105 (1976). To show deliberate indifference, Logan must prove that the prison doctors knew of, yet disregarded, an excessive risk to his health. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Logan has demonstrated two medical needs that, at least for purposes of our review of the District Court's grant of summary judgment, were serious: substantial back pain and a painful fungal skin infection. Logan's principal claim of deliberate indifference comes from the delay in referring him to a specialist, but he also contends that his treatment was generally substandard. We do not agree that either the delay or the quality of treatment fell to the level of deliberate indifference.

The evidence, when viewed most favorably to Logan, demonstrates that the prison doctors attempted to treat Logan on numerous occasions, beginning before his arrival at NSP. The doctors offered Logan an opportunity to receive pain-killing treatment for his back. Although Logan may have refused this treatment because he had not been apprised of the potential risks, the prison's offer demonstrates the doctors were not consciously disregarding his need. The prison doctors subsequently offered Logan other types of pain killers, although their choices were limited by concerns over Logan's history of drug abuse. Logan does not claim that the painkillers he was given were completely ineffective. He cannot expect them to eliminate all pain — painkillers usually do not. The doctors did refuse to issue Logan a bottom bunk and special shoes, but Logan has not demonstrated that they did not consider his asserted needs in good faith. The doctors rejected the request for shoes because they did not consider them a solution to Logan's problem and rejected his request for a bunk because he did not meet the requisite criteria, which we do not think were unreasonably applied to Logan's case. We think the efforts the prison doctors took to allay Logan's pain, while perhaps not as extensive as those a private health-care provider might have taken, did not reflect deliberate indifference to his medical needs.

Logan's other medical need was a cure for his skin infection. The first visit to a prison doctor resulted in a conclusion that the condition might clear up by itself. When it did not, the prison doctors, within a month of Logan's initial complaint, prescribed medication and further treatment. The treatment became more aggressive as the doctors realized the fungus was not going away. Logan was seen by a dermatologist within three months of his initial complaint, and more extensive treatment was offered. The doctors' efforts, which were impeded by Logan's apparent inability or refusal to follow their instructions, cannot be said to have been deliberately indifferent. Although the prison doctors may not have proceeded from their initial diagnosis to their referral to a specialist as quickly as hindsight perhaps allows us to think they should have, their actions were not deliberately indifferent. The doctors made efforts to cure the problem in a reasonable and sensible manner.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.