# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2167

_____

Joe Willie Cannon

*Plaintiff - Appellee*

v.

Michael Dehner, Doctor; Amy Shipley, Nurse;
Courtney Friedman, Nurse; Barbara Devaney, Nurse

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: January 10, 2024
Filed: August 13, 2024

_____

Before LOKEN, KELLY, and STRAS, Circuit Judges.

_____

LOKEN, Circuit Judge.

Iowa inmate Joe Willie Cannon, serving a life sentence, brought this 42 U.S.C. § 1983 action in November 2021 against eight officials at the Anamosa State Penitentiary ("ASP") in their individual capacities, alleging they violated his Eighth Amendment rights by failing to treat and by incorrectly treating his right wrist, injured when he fell playing basketball at ASP in August 2020. After the close of

discovery, defendants moved for summary judgment, arguing they are entitled to qualified immunity. The district court denied the motion as to four defendants, who appeal the court's interlocutory order. We have jurisdiction to review appeals from the denial of qualified immunity. Our review is "limited to determining whether all of the conduct that the district court deemed sufficiently supported for purposes of summary judgment violated the plaintiff's clearly established federal rights." McDaniel v. Neal, 44 F.4th 1085, 1088 (8th Cir. 2022) (quotation omitted). We review *de novo* the legal question of qualified immunity. Id. at 1089. Viewing the facts in the light most favorable to Cannon, the nonmoving party, we reverse.

## I.

On August 2, 2020, a Sunday afternoon, Cannon lost his balance while playing basketball at ASP and injured his right wrist when he fell. At that time, the ASP Health Services infirmary had designated sick call hours from 8:15 to 10:15 a.m., Monday through Friday. Inmates who reported to the infirmary during sick call hours would be seen by medical staff. Inmates could request an appointment by sending a kiosk message to Health Services. The infirmary was staffed 24/7, consistent with ASP's duty to give inmates around-the-clock access to medical services. Inmates could go to the infirmary outside of sick call hours and request to be seen by medical staff without an appointment. They would only be seen if an intake officer or nurse assessed a medical emergency.

Shortly after he fell, Cannon encountered Nurse Courtney Friedman outside his living quarters. In his affidavit opposing summary judgment, Cannon averred that he explained how he had fallen and showed Nurse Friedman his hand. She stated there appeared to be something wrong with his wrist and asked Cannon if he could wait and go to the infirmary during scheduled sick call hours the next day. Nurse Friedman testified she did not recall this encounter.

-2-

Later, a corrections officer told Cannon to go to the infirmary to have his wrist examined. Cannon went to the infirmary around 5:00 p.m. He told the front desk officer, Rachel Parker, he was in pain after a fall earlier in the day, showed Parker his swollen wrist, and asked to see a nurse. Officer Parker went into the infirmary while Cannon remained in the waiting area. She returned and explained the nurses would not see Cannon unless it was an emergency. Cannon again showed Parker and another officer his wrist and said "I could not move my fingers, and I really wanted to see someone for this." Nurse Barbara Devaney then entered the waiting area from the infirmary. Cannon's affidavit asserts that, with Nurse Friedman present, Devaney asked, "Why are you still here? You have already been told that you will not be seen by anyone, so you can leave now." Cannon said "I could not wait until tomorrow, I needed someone to address my wrist now." Devaney said, "Didn't I tell you that no one is going to see you, I have already told you to leave, so leave right now."

Cannon's affidavit asserts that neither Devaney nor Friedman "conducted any kind of physical examination on my wrist at this time." In her deposition, Nurse Devaney described a very different encounter. She testified that, while Cannon was describing his situation and "very abruptly tell[ing] me what needed to happen, I did do all the observations" needed to determine that it was not an emergency. "I offered him intervention of taking himself back to the cell, putting some ice on the area, elevate it, rest it, and then come back to sick call in the morning." Cannon's affidavit asserts that "[a] corrections officer, Captain Hall, told me to ice my hand and report to sick call in the morning." That night, "[t]o manage my pain, I improvised a splint out of a hard back phone book and a string from my gym bag."

The next morning, Cannon sent a kiosk message to Health Services stating that he thought he had broken his hand and requesting to see the doctor. He went to the infirmary at the start of sick call hours and was seen by Nurse Amy Shipley. In her notes of the visit, Shipley observed that Cannon was "able to perform opposition, though [it was] somewhat difficult to do with [his] right thumb," that his range of

motion was limited, and that there was tenderness to palpation. She treated Cannon's wrist with an ACE bandage wrap, told him to use ice as needed to reduce swelling, gave him an extra pillow with instructions to elevate his right hand, and requested a ten-day order for the pain-killer Motrin from the prison doctor, Michael Dehner, which he supplied. Nurse Shipley did not consult Dr. Dehner about Cannon's injury or request an X-ray. Her visit notes state that she scheduled a recheck that "[s]hould have been one week." It was not scheduled.

Four days later, on August 7, Cannon sent a kiosk message requesting to see the doctor. A nurse promptly responded and, when Cannon explained what was wrong, said she would schedule an appointment with the doctor. On August 13, Cannon sent another kiosk message, requesting the date of his appointment. A nurse responded, told Cannon he did not have an appointment, and said she had added him for Monday, August 17. Again, no appointment was scheduled. On August 18, Cannon sent another kiosk message saying he was "in constant pain" and thought there was a broken bone in his wrist. A few hours later, a nurse instructed Cannon to come to the infirmary during sick call hours the following morning "to be evaluated further and see if X-Ray is needed."

Nurse Amy Neuhaus examined Cannon the following morning, August 19. Cannon told Nurse Neuhaus about his wrist injury and said he was at sick call to see if he needed an X-ray because, despite the ACE bandage wrap, his wrist still hurt. Examining Cannon's wrist, Nurse Neuhaus noted limited range of motion, tenderness to palpation, swelling, and inability to flex or extend without pain. Nurse Neuhaus then consulted with Dr. Dehner. Based on her exam, Dr. Dehner ordered a cock-up wrist splint, continued ibuprofen for pain, and an on-site X-ray. He did not examine Cannon that day.

Cannon's wrist was X-rayed on August 22, the next day the ASP X-ray technicians were on-site. Two days later, Dr. Dehner reviewed the X-ray and met

with Cannon, who reported he had been experiencing joint pain and numbness since the injury, which ibuprofen helped alleviate. Cannon told Dr. Dehner he had been wearing the splint during the day; his wrist was very painful at night without it. Based on his review of the X-ray, Dr. Dehner told Cannon his wrist had a nondisplaced fracture and he would refer Cannon to the University of Iowa Hospitals & Clinics ("UIHC") for a cast as soon as possible. Dr. Dehner made the referral but left the "urgency of appointment" line on the referral blank.

On Monday, September 7, Cannon filed a Grievance concerning the medical treatment of his wrist injury. He described his interactions with medical staff, delays in getting medical attention, and the perceived inadequacy of the medical treatment once received. He stated that he had not been taken to UIHC for medical care two weeks after Dr. Dehner told him he urgently needed to go to UIHC for a cast.

On September 10, Cannon was seen at UIHC. A second X-ray was taken of his wrist. A UIHC orthopedic nurse practitioner ("NP") diagnosed the wrist as having a "minimally displaced comminuted intra-articular right distal radius fracture." The NP determined the wrist had started to heal in a slightly displaced position, so it was too late for a cast. She instructed Cannon to continue to wear the splint and to follow up in about a month.

Cannon continued to suffer problems with his wrist and hand over the next year. He received treatment from the NP at UIHC, Dr. Dehner, and nurses at the prison. After new X-rays of his wrist were taken in April 2021, UIHC providers diagnosed ulnar compaction syndrome as the source of his continued pain -- the displaced position of the healed fracture was impacting surrounding nerves, tendons, and muscles. Cannon underwent corrective surgery in which his ulnar was broken to bring it back into alignment with the displaced radius.

## II.

Cannon filed this § 1983 suit in November of 2021 against eight ASP employees alleging deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights. All defendants moved for summary judgment, arguing they are entitled to qualified immunity. Cannon opposed the grant of summary judgment to four defendants: Dr. Dehner, and Nurses Devaney, Friedman, and Shipley ("Appellants").[1] Cannon alleged that Appellants' delay in diagnosing and treating his broken wrist constituted deliberate indifference to his serious medical need. He presented expert medical testimony that the delay in diagnosing the fracture as displaced "ultimately [led] to secondary consequences including new right wrist pain as a result of ulnar compaction syndrome which required surgery to improve."

Government employees sued in their individual capacities under § 1983 may assert the affirmative defense of qualified immunity. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). The burden rests with the plaintiff to defeat the defense. "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (quotation omitted).

The district court denied Appellants' summary judgment motion. Viewing the facts in the light most favorable to Cannon, the court concluded that a reasonable jury could find that each Appellant had acted with deliberate indifference to Cannon's objectively serious medical needs, thus violating his Eighth Amendment rights. The

---

[1]Cannon agreed that his claims against ASP Warden Kristoffer Karberg and Nurses Sally Potter, Amy Neuhaus, and Laura Barner should be dismissed. The district court dismissed these four defendants.

court cited cases holding that "unreasonable delay in providing the recommended treatment for a diagnosed broken hand" violated the Eighth Amendment and concluded Cannon's rights were clearly established before August 2020. On appeal, Appellants challenge both rulings.

A government official is "only liable for his or her own misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). When there are multiple defendants who played limited roles in the conduct complained of, the determination whether an individual defendant is entitled to qualified immunity is based upon that defendant's knowledge and conduct at the time or times he or she participated in that conduct. See, e.g., Bulfin v. Rainwater, 104 F.4th 1032, 1039 (8th Cir. 2024); Ellis v. Houston, 742 F.3d 307, 320 (8th Cir. 2014). The district court's failure to acknowledge and properly apply that principle means the denial of qualified immunity must be reversed.

## III.

To establish his Eighth Amendment claim against any Appellant, Cannon must prove that he or she committed "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). There are two elements to this requirement. First, Cannon must "demonstrate an objectively serious medical need." Corwin v. City of Independence, 829 F.3d 695, 698 (8th Cir. 2016). Second, he must show that Appellant "actually knew of, but deliberately disregarded, such need." Id.

**A.** Regarding the first element, the district court simply held that the parties do not dispute that Cannon's broken wrist was an objectively serious medical need. That is an inadequate analysis of a complex issue. "To constitute an objectively serious medical need or a deprivation of that need, . . . the need or the deprivation alleged must be either obvious to the layperson or supported by medical evidence,

like a physician's diagnosis." Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995) (citations omitted); see Dadd v. Anoka Cnty., 827 F.3d 749, 755 (8th Cir. 2016).

Here, *prior to Dr. Dehner's initial diagnosis*, Cannon's repeated assertions that he was suffering from a "broken wrist" were unsupported by a physician's diagnosis. An inmate's bare assertions are insufficient evidence of serious medical need. Id. That does not mean Cannon did not have an objectively serious medical need when he saw the three nurse defendants prior to Dr. Dehner's diagnosis. Indeed, they each recognized a need to assess and develop a treatment plan for Cannon's wrist injury. But unless a *broken* wrist was "obvious to a layperson," their decision to treat the injury more conservatively than if they knew the wrist was broken did not, as the district court assumed, establish they were deliberately indifferent to his serious medical need. Deliberative indifference is a subjective inquiry requiring the court to assess each defendant's "knowledge at the time in question, not by hindsight's perfect vision." Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011) (quotation omitted).

**B.** Deliberate indifference is akin to criminal recklessness, falling somewhere between "negligence at one end and purpose or knowledge at the other." Farmer v. Brennan, 511 U.S. 825, 836 (1994). In Estelle, 429 U.S. at 105-06, the Supreme Court explained:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain." . . . Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

Thus, "[n]egligent misdiagnosis does not create a cognizable claim under § 1983." McRaven, 577 F.3d at 982, citing Estelle, 429 U.S. at 106. "Grossly incompetent or

-8-

inadequate care can constitute deliberate indifference but the care provided must be so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." Dulany v. Carnahan, 132 F.3d 1234, 1242 (8th Cir. 1997) (quotation omitted). "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and [prison medical professionals] remain free to exercise their independent medical judgment." Id. at 1239.

Our prior cases confirm that these principles govern Eighth Amendment claims against prison nurses assigned the pre-diagnosis tasks of assessing an inmate's injury, developing a treatment plan, and consulting with or referring the inmate to a physician when appropriate. For example, in Jenkins v. County of Hennepin, 557 F.3d 628, 632 (8th Cir. 2009), we affirmed the grant of qualified immunity to a licensed registered nurse accused of deliberate indifference for postponing an X-ray of an inmate's broken jaw:

> Her decision to briefly postpone an X-ray (ultimately for less than twenty-four hours) reflects a medical judgment that Jenkins's injury, though possibly serious, was not urgent. That conclusion is supported by the fact that Jenkins cannot show that the one-day delay was detrimental to his recovery. Moreover, even if the better medical practice would have been to expedite Jenkins's treatment or provide more effective pain relief during the interim, there is no evidence that [her] failure to order these measures was anything more than negligence.

Accord Fourte v. Faulkner Cnty., 746 F.3d 384, 390 (8th Cir. 2014) (delay in writing second prescription when ordered medications did not arrive was not deliberate indifference); Sherrer v. Stephens, 50 F.3d 496, 496-97 (8th Cir. 1994).

To be sure, "in cases where some medical care is provided, a plaintiff is entitled to prove his [Eighth Amendment] case by establishing the course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate

indifference." Allard v. Baldwin, 779 F.3d 768, 772 (8th Cir. 2015) (quotation omitted). However, "a healthcare provider need not accept as true medical judgments offered by their patients but must make treatment decisions on the basis of many factors, only one of which is the patient's input." Id. at 772-73.

Because the qualified immunity determination is specific to each individual Appellant's alleged conduct, we separately address the denial of qualified immunity to each Appellant. See Walton v. Dawson, 752 F.3d 1109, 1125 (8th Cir. 2014).

### A. Nurse Devaney

Nurse Devaney had one encounter with Cannon -- when he came to the infirmary after hours on August 2, the day of the injury, and demanded that he have an X-ray taken and meet with a doctor immediately. Ignoring Nurse Devaney's deposition testimony to the contrary, the district court concluded a reasonable jury could find that Devaney was deliberately indifferent to Cannon's serious medical need -- a broken wrist -- because she "refused to treat him without conducting any kind of evaluation [telling] him to leave, sight unseen." The *refusal* to examine or treat is critical to the deliberative indifference analysis because "[n]egligent misdiagnosis does not create a cognizable claim under § 1983." McRaven, 577 F.3d at 982, citing Estelle, 429 U.S. at 106. If this is a claim of misdiagnosis, Nurse Devaney is entitled to qualified immunity. On this summary judgment record, with detailed testimony regarding the encounter by Devaney and only bare contrary assertions by Cannon, we strongly doubt a reasonable jury could find deliberate indifference.

We agree with Cannon and the district court that the conflicting affidavit and testimony regarding this encounter raise factual disputes that we may lack jurisdiction to resolve on appeal from the denial of qualified immunity. See McDaniel, 44 F.4th at 1088-89. But the errors in the district court's analysis go much deeper. First, there

had been no diagnosis, so the serious medical need obvious to Nurse Devaney was the need to assess the injury and then act accordingly. Second, Nurse Devaney's authority to "treat" the undiagnosed injury was limited to assessment, plan treatment, and referral to a doctor, which she could not have done the evening of August 2. Third, everything Nurse Devaney could have done that evening -- ice the wrist, immobilize it that night, and perhaps provide over-the-counter pain medication (unclear on this record) -- Cannon was advised to do by other correction officers and did himself (including taking two acetaminophen pills that afternoon). Finally, and most importantly, Cannon was seen at the infirmary at 8:15 the next morning, when the assessment, planning, and initial doctor contact was done by Nurse Shipley. Cannon presented no evidence of injury caused by Devaney's conduct in that fifteen-hour period (his wrist pain that night was not caused by Nurse Devaney's alleged failure to examine), and no evidence that Devaney had any further contact with Cannon regarding the injured wrist, or any involvement in the subsequent alleged treatment inadequacies and delays. On this record, Nurse Devaney is entitled to summary judgment and qualified immunity for many reasons.

## B. Nurse Friedman

Nurse Friedman observed Cannon's wrist earlier on August 2 when Cannon talked to her outside where he resided. She agreed something looked wrong and directed him to go to sick call in the morning. Then, though Friedman denies it, we must assume she was present in the infirmary when Cannon described his symptoms to Nurse Devaney, as Cannon alleges. But assuming Nurse Friedman did not provide medical care or examine the injured wrist, as Cannon alleges, the summary judgment record reflects that Nurse Friedman's involvement in the conduct complained of was limited to these two brief encounters on August 2, when the obvious serious medical need was an injured wrist, not a broken wrist. Thus, Nurse Friedman is entitled to summary judgment for the same reasons as Nurse Devaney.

-11-

## C. Nurse Shipley

Nurse Shipley, an experienced registered nurse, saw Cannon at sick call on Monday morning, less than twenty-four hours after he injured his wrist. Nurse Shipley testified that only a doctor is able to diagnose a broken bone but management of symptoms is part of a nurse's duties. After assessing a potentially broken bone, ASP nursing protocols counsel that the patient should be referred to a doctor if the injury is emergent; if it is not emergent, a nurse should form a treatment plan. Nurse Shipley testified that gross displacement, gross swelling, and open wounds are all indications that an injury is emergent.

On the morning of August 3, Cannon's reported symptoms, as recorded in Nurse Shipley's visit notes and confirmed in deposition testimony, reflect that she knew there was a risk that Cannon's wrist was broken. But she observed no obvious displacement or deformity, Cannon maintained a limited range of motion, and, while the wrist was swollen and painful, this visit was less than twenty-four hours after the injury. She concluded Cannon's wrist injury was not emergent and did not require immediate referral to a doctor for an X-ray and diagnosis. Nurse Shipley applied an ACE wrap and issued orders for ice and Motrin painkiller medication, consistent with her typical treatment of a nonemergent injury. She testified that a nonemergent injury should be reassessed at a recheck appointment to determine if referral to a doctor is necessary. Her visit notes reflect that she scheduled a recheck. Cannon's affidavit avers that Shipley "told me I would be placed on the list to see the doctor in the coming days." No recheck appointment was scheduled.

The district court concluded that a reasonable jury could find that Nurse Shipley acted with deliberate indifference in treating Cannon's wrist injury because she knew it should be treated as a suspected fracture, which required notice to Dr. Dehner, and failed to schedule a follow-up appointment, which went beyond mere

negligence "based on the prison medical staff's 'repeated pattern of neglect' in scheduling a follow-up appointment for Cannon." We disagree.

Nurse Shipley's failure to consult with Dr. Dehner the day after Cannon's wrist injury does not reflect deliberate indifference. After examining the wrist and evaluating Cannon's demands for an X-ray and to see a doctor, Nurse Shipley determined that the injury was nonemergent and treated the wrist accordingly. Cannon contends Nurse Shipley should have consulted Dr. Dehner immediately so an X-ray could be ordered. But not following Cannon's more aggressive treatment demands is not deliberate indifference to his injury. "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and [Nurse Shipley] remain[ed] free to exercise [her] independent medical judgment." Dulany, 132 F.3d at 1239. Based on the information available to Nurse Shipley at the time, her treatment of Cannon's wrist was not so inadequate as to amount to intentional maltreatment. See Corwin, 829 F.3d at 698.

Cannon presented no evidence that Nurse Shipley's failure to schedule a recheck appointment was deliberate; at worst, she acted negligently when she forgot to schedule the appointment. "While the intentional failure to schedule an appointment with a medical specialist may amount to deliberate indifference when it causes substantial harm, the negligent failure to schedule an appointment does not." Thomas v. Carter, 593 F. App'x 338, 344 (5th Cir. 2014) (citations omitted); see Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006). The case cited by the district court for its "repeated pattern of neglect" exception to this rule, De Rossitte v. Correct Care Solutions, LLC., 22 F.4th 796, 803-04 (8th Cir. 2022), is completely off-point factually and is distinguishable because it did not involve multiple defendants with limited roles in the conduct complained of. Any delays resulting from Cannon's other kiosk message requests for an appointment that went unfulfilled cannot be attributed to Nurse Shipley. Cannon admits that other nurses promptly responded to those messages and does not allege Nurse Shipley was involved with

or aware of these communications. Again, the district court's analysis ignores the fundamental principle that, in § 1983 suits, "[a]n individual defendant is only liable for his or her own misconduct." Ellis, 742 F.3d at 320 (quotation omitted).

The August 3 visit is Nurse Shipley's only involvement in the conduct complained of. Cannon concedes Shipley provided medical care, unlike Nurses Devaney and Friedman. His affidavit alleges that, four days later, he sent a kiosk message asking to see a doctor because "I was not feeling any improvement." Another nurse promptly responded, saying she would schedule an appointment that did not take place until August 19. Cannon presented no evidence of injury caused by Nurse Shipley's allegedly inadequate treatment in that four-day period, and no evidence that Shipley had any further contact with Cannon regarding the injured wrist, or any involvement in the subsequent alleged treatment inadequacies and delays. On this summary judgment record, Nurse Shipley is entitled to summary judgment and qualified immunity.

### D. Dr. Dehner

The record reflects that Dr. Dehner was not aware of Cannon's possibly broken wrist until his consult with Nurse Neuhaus on August 19, who told him that Cannon had injured his wrist seventeen days earlier and that it was swollen and tender with a limited range of motion. Nurse Neuhaus believed Cannon might have a broken wrist. Dr. Dehner ordered a cock-up splint and an X-ray. There is no evidence Dr. Dehner knew at this time that Cannon may have suffered a displaced fracture. He testified that X-rays are the "easiest way to find out" if a fracture is displaced, but "you can tell clinically if there's deformity that something's displaced." Nurse Neuhaus did not note any deformity in Cannon's wrist nor did Cannon describe anything resembling deformity. On August 22, Cannon's wrist was X-rayed on-site at ASP.

-14-

On August 24, Dr. Dehner reviewed the X-ray and determined that it showed a nondisplaced fracture. He examined Cannon that day, noting that Cannon did not have any muscle weakness and had full range of motion in his hand and wrist, but suffered from wrist pain with movement. Cannon did not report and Dr. Dehner did not observe any deformity. Thus, from August 19 to September 10, Dr. Dehner knew Cannon's wrist was likely broken, but did not know that there was a serious risk it was healing in a displaced position.[2]

The district court concluded that a reasonable jury could find that Dr. Dehner acted with deliberate indifference to Cannon's serious medical need because he knew on August 19 that Cannon may have a broken wrist; reviewed an X-ray on August 24 showing a displaced fracture (this finding is unsupported, see footnote 2); knew "a displaced bone needs a cast to heal properly" and would begin healing incorrectly five weeks after the injury; prepared a referral to UIHC that did not state its urgency; and Cannon was not sent to UIHC until September 10, when it was too late for a cast resulting in a need for corrective surgery many months later.

To defeat the defense of qualified immunity "in cases where some medical care is provided, a plaintiff is entitled to prove his case by establishing the course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference." Allard, 779 F.3d at 772 (quotation omitted). Cannon's evidence of Dr. Dehner's involvement fails to meet this standard. On August 19, Dr. Dehner did not himself examine Cannon, but he prescribed a cock-up splint and

---

[2]The district court's opinion and order states that Dr. Dehner knew Cannon had a displaced fracture in his wrist. This finding is unsupported by the record. Dr. Dehner testified that his review of Cannon's X-ray on August 24 showed a nondisplaced fracture. Cannon's affidavit states that "Dr. Dehner reviewed an x-ray and said I had an 'undisplaced colles fracture.'" It was not until Cannon's second X-ray at UIHC was reviewed by the orthopedic NP that any medical professional diagnosed a displaced fracture.

ordered an X-ray to determine if Cannon's wrist was broken based on Nurse Neuhaus's evaluation. See Hartsfield v. Colburn, 491 F.3d 394, 398 (8th Cir. 2007) (holding prison doctor's decision not to personally examine inmate was not deliberate indifference where he relied on a nurse's report). Dr. Dehner's decision not to order an immediate off-site X-ray likewise does not rise to the level of deliberate indifference. He testified that he was authorized to refer inmates for immediate X-rays offsite in "urgent" cases, including cases of displacement and loss of function. On August 19, Dr. Dehner did not know Cannon may have a displaced fracture. He testified that a patient's "inability to flex or extend without pain" did not qualify as a loss of function. Thus, his decision to order an on-site X-ray three days later "reflects a medical judgment that [Cannon's] injury, though possibly serious, was not urgent." Jenkins, 557 F.3d at 632. Cannon presented no evidence that the decision was based on anything other than Dr. Dehner's medical opinion. See Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004) (withholding or delaying medical treatment for "nonmedical reasons" may amount to deliberate indifference). In Johnson, we held that a month-long delay between a nurse's tentative diagnosis of a fractured finger and the inmate getting an X-ray confirming the fracture was not deliberate indifference. 452 F.3d at 973.

That Dr. Dehner delayed two days before reviewing the X-ray he ordered does not constitute deliberate indifference. The record is silent as to when the X-ray results were made available to Dr. Dehner, and Cannon presented no evidence that Dr. Dehner deliberately delayed reviewing Cannon's X-rays. See Fourte, 746 F.3d at 390 (lack of "intentional delay" evidence meant that prison doctor and nurse were, "[a]t most," negligent).

Regarding the two-and-one-half week delay between Dr. Dehner referring Cannon to UIHC and Cannon actually being seen at UIHC, the record does not establish whether the delay was caused by the omission of urgency in Dr. Dehner's referral or by other factors, such as appointment availability. Even if entirely

attributable to Dr. Dehner's failure to indicate urgency, the resulting delay evidences at most negligence, absent evidence that Dr. Dehner intentionally delayed the referral. Dr. Dehner made the appropriate referral request but simply neglected to fill out the urgency line. See id., citing Hartsfield, 491 F.3d at 396-98. Once Cannon alerted the medical staff that his orthopedic appointment had not been scheduled, an appointment was promptly scheduled. See Cose v. Gorske, 761 F. App'x 603, 607 (7th Cir. 2019).

Lacking knowledge on August 24 that Cannon's wrist was at risk of healing in a displaced position, Dr. Dehner did not act with deliberate indifference to the risk the wrist was healing in a position that would require corrective surgery. Dr. Dehner immobilized Cannon's wrist with a splint and prescribed various treatments to manage his symptoms while Cannon waited for his orthopedic appointment. He did not ignore Cannon's injury; he treated it as he would a nondisplaced fracture in accordance with his medical judgment. "Although [Dr. Dehner] may not have proceeded . . . as quickly as hindsight perhaps allows us to think [he] should have, [his] actions were not deliberately indifferent. [Dr. Dehner] made efforts to cure the problem in a reasonable and sensible manner." Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997); see Sherrer, 50 F.3d at 496-97. On this summary judgment record, Dr. Dehner is entitled to summary judgment and qualified immunity.

## IV.

We conclude that each Appellant is entitled to qualified immunity because Cannon failed to prove that he or she acted with deliberate indifference to Cannon's serious medical needs. Therefore, we need not address Appellants' alternative contention that they are entitled to qualified immunity because the specific Eighth Amendment rights at issue were not clearly established in August 2020. The Order of the district court dated April 14, 2023 is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

KELLY, Circuit Judge, dissenting in part and concurring in part.

I agree that Appellant Friedman is entitled to qualified immunity based on the insufficient evidence supporting the claim against her. As to the remaining Appellants, however, there are genuine disputes of material fact that should be submitted to a factfinder. Viewing those disputed facts in the light most favorable to Cannon, as we must do, a reasonable jury could find that the other medical providers knew Cannon suffered a serious medical need and that they were deliberately indifferent to it. For the reasons stated by the district court in its thorough opinion, I would affirm the denial of qualified immunity as to these remaining Appellants and send the case to trial.

_____